## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**LUCKY COUSINS TRUCKING INC.,**

      **Plaintiff,**

**v.**                            **CASE NO. 8:16-cv-866-T-26TGW**

**QC ENERGY RESOURCES**
**TEXAS, LLC, *et al.*,**

      **Defendants.**

_____/

## <u>COUNTER-PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

Counter-Plaintiffs, QC Energy Resources, LLC, QC Energy Resources Texas, LLC, and Quality Carriers, Inc., move pursuant to Fed. R. Civ. P. 65(a) and M.D. Fla. R. 4.06 for a preliminary injunction against Counter-Defendants, Lucky Cousins Trucking Inc., Givo Younani, and Skyline Transport Group, LLC, enjoining them from violating the non-compete, non-solicitation, and non-disclosure obligations in the parties' Contractor Agreement.

## I.      INTRODUCTION

Counter-Plaintiffs provide logistics and transportation services in the chemical and oil and gas industries.  *See* Affidavit of John McAvoy, VP of Affiliate Relations ("McAvoy Aff.") ¶ 6, filed in support of this motion.  Counter-Plaintiffs provide services to their customers directly and through independent contractor affiliates.  *See* Affidavit of Joseph Troy, Executive VP and CFO of Quality Distribution, Inc. ("Troy Aff.") ¶¶ 6 & 8, filed in support of this motion. Engaging qualified affiliates is essential to Counter-Plaintiffs' business.  (*Id.* ¶ 10)  As such, Counter-Plaintiffs provide substantial support and assistance to affiliates to ensure that they have the necessary resources and training to provide safe, reliable transportation services to Counter-

Plaintiffs' customers.  (*Id.* ¶ 11; McAvoy Aff. ¶ 11)  This support includes access to Counter-Plaintiffs' valuable confidential information and trade secrets.  (McAvoy Aff. ¶¶ 16 &17)  To protect this investment as well as customer relationships and goodwill, Counter-Plaintiffs ask affiliates to enter contractor agreements that include non-compete, non-solicitation, and confidentiality provisions.  (Troy Aff. ¶ 20)  Lucky Cousins Trucking, Inc. ("Lucky Cousins") was no exception to this policy.

Lucky Cousins was an independent contractor affiliate of Counter-Plaintiffs for less than two years, during which Counter-Plaintiffs continuously secured work for Lucky Cousins in several states and paid Lucky Cousins generous revenue shares.  (McAvoy Aff.  ¶¶ 8-13 & 32)  Counter-Plaintiffs gave Lucky Cousins requested financial concessions and cash assistance of more than one million dollars to support its operations.  (*Id.* ¶ 21)  Despite substantial assistance from Counter-Plaintiffs, Lucky Cousins failed to prosper, and its President, Givo Younani, established Skyline Transport Group, LLC ("Skyline Transport") as a competing business in violation of restrictive covenants in the Contractor Agreement.  (*Id.* ¶ 29-46)  Counter-Defendants' motivations are transparent—they hoped to cut Counter-Plaintiffs out of the revenue stream from Counter-Plaintiffs' customers and avoid significant financial obligations in order to funnel profits into Mr. Younani's pocket.

The problem for Counter-Defendants is that their conduct is prohibited by the terms of the Contractor Agreement, prohibitions which extend beyond the term of the Contractor Agreement.  Upon discovering Counter-Defendants' efforts to compete, and for other reasons, Counter-Plaintiffs terminated the Contractor Agreement.  This motion seeks a preliminary injunction that, among other things, enforces the restrictive covenants in the Contractor Agreement and enjoins Counter-Defendants from competing with Counter-Plaintiffs, interfering

with Counter-Plaintiffs' customer relationships, and using or disclosing Counter-Plaintiffs' trade secrets and other confidential information.

## II.     FACTUAL BACKGROUND

Counter-Plaintiffs, QC Energy Resources, LLC, QC Energy Resources Texas, LLC, QC Energy Resources, Inc. (collectively "QC Energy Resources"), and Quality Carriers, Inc., are subsidiaries of Quality Distribution, Inc., a Florida corporation with its principal place of business and headquarters in Tampa, Florida.  Quality Distribution traces its history to 1913, and it provides bulk transportation and logistics services throughout North America through its subsidiaries, including QC Energy Resources and Quality Carriers.  (Troy Aff. ¶¶ 3 & 4)

Quality Carriers is the largest liquid bulk transportation company in North America, and specializes in chemical transportation.  Quality Carriers provides services for many of the Fortune 500 companies in the chemical industry.  Quality Carriers has over 100 terminals throughout the U.S. and in Canada and Mexico.  (*Id.* ¶¶ 5 & 6)  QC Energy Resources provides logistics and transportation services to the oil and gas industry, including transportation of crude oil, fresh water and production fluids.  (*Id.* ¶ 7; McAvoy Aff. ¶ 6)  QC Energy Resources has had terminals or other operations in eleven states including Colorado, Kansas, Kentucky, Ohio, Oklahoma, Pennsylvania, Montana, New Mexico, North Dakota, Texas, West Virginia, and Wyoming, and has served customers throughout the U.S.  (Troy Aff. ¶ 9)  QC Energy Resources and Quality Carriers provide transportation services to their customers directly and also engage sub-haulers and independent contractors.  (*Id.* ¶¶ 6 & 8)

Between November 2013 and June 2015, the parties entered into a series of agreements. (McAvoy Aff. ¶¶ 7-26)  The primary agreement was a June 14, 2014 Contractor Agreement entered by QC Energy Resources, Quality Carriers, and Lucky Cousins pursuant to which Lucky

Cousins agreed to perform transportation services for QC Energy Resources, Quality Carriers, and their customers as an independent contractor affiliate.  A copy of the Contractor Agreement is attached as Exhibit 2 to the McAvoy Affidavit.  (*Id.* ¶¶ 8-12 & Ex. 2)  Under the Contractor Agreement, Lucky Cousins provided transportation services hauling crude oil, water, acid, chemicals, and equipment in (among other places throughout the U.S.), Kentucky, New Jersey, Ohio, Oklahoma, Texas, and Wyoming.  (*Id.* ¶ 13)

In the Contractor Agreement, Lucky Cousins agreed, among other things, that neither Lucky Cousins nor its principals would compete with QC Energy Resources and Quality Carriers nor solicit their customers during the term of the Contractor Agreement and for a period of two years following termination. Specifically, the Contractor Agreement states:

> During the Term [of the Contractor Agreement] and for a period of two (2) years thereafter, Contractor [Lucky Cousins] and its owners, managers, partners, directors, stockholders, and principal operating and financial officer(s) (collectively, "Contractor's Principals") shall not directly or indirectly:  (i) engage in a Competitive Business, as hereinafter defined; (ii) have any material interest (whether as a proprietor, partner, shareholder, associate, or any type of principal or owner whatsoever) in any person, firm, partnership, joint venture, or other business entity (each, an "Entity") that is engaged in a Competitive Business (other than an ownership interest not exceeding 5% of a publicly held company); (iii) provide financial or other assistance, or act as an agent of, consultant for, or advisor to, any Entity that is, or becomes, engaged in a Competitive Business; or (iv) sell, lease or otherwise provide transportation equipment (e.g., tractors, trailers) to any Entity that is, or becomes, engaged in a Competitive Business.

> During the Term [of the agreement] and for a period of two (2) years thereafter, Contractor and Contractor's Principals shall not directly or indirectly:  (i) request, induce or advise any person to withdraw, curtail or cancel their business with QCER [QC Energy Resources]; (ii) request, induce or advise any person employed by or under contract with QCER to terminate or breach the terms of such employment or contract.

The term "Competitive Business" is defined in the Contractor Agreement as:

> the management, ownership, or operation of, or connection in any manner with, within the continental United States or Canada, any business involving the provision of any of the following services with respect to the upstream or midstream energy industry and any Chemical Business: (i) transportation; (ii) transloading; (iii) logistics services; (iv) disposal; or (v) freight forwarding, shipping, or brokerage services.

(*Id.* at Ex. 2 § 19 & 05/28/15 Amendment § 4)  Section 16 of the Contractor Agreement gave QC Energy Resources the right to terminate the agreement with immediate effect in the event that Lucky Cousins engaged in intentional misconduct or fraudulent acts, or became insolvent.  (*Id.* at Ex. 2 § 16)  Section 16 is unequivocal that the restrictive covenant survives termination.

Under the Contractor Agreement, Lucky Cousins initially received compensation of 83.5% of billed transportation revenues and higher percentages of other billed revenue items. (McAvoy Aff. ¶ 9)  Through amendments to the Contractor Agreement and other concessions given by Counter-Plaintiffs, Lucky Cousins received as much as 95% of billed transportation revenues. (*Id.*)

QC Energy Resources and Lucky Cousins amended the Contractor Agreement several times to, among other things: (a) expand Lucky Cousins' authorization to perform transportation services for QC Energy Resources and its customers; (b) allow Lucky Cousins to participate in QC Energy Resources' fuel discount program; (c) add Quality Carriers as a party to the Contractor Agreement and authorize Lucky Cousins to perform transportation services for Quality Carriers and its customers; and (d) authorize Lucky Cousins to perform transportation services for Quality Distribution subsidiary Boasso America Corporation.  (McAvoy Aff. Ex.2) The amendments to the Contractor Agreement are part of Exhibit 2 to the McAvoy Affidavit.

The Contractor Agreement gave Lucky Cousins access to QC Energy Resources' customer base and other valuable rights in performing transportation services for QC Energy Resources' customers.  (Troy Aff. ¶¶ 14-19; McAvoy Aff. ¶ 11)  As an affiliate of QC Energy Resources, Lucky Cousins also had access to and utilized QC Energy Resources' confidential information.  (*Id.* ¶¶ 16-17; *see* Affidavit of Nicholas Schrader, Vice President of QC Energy Resources for facilities in the Northeast region ("Schrader Aff.") ¶ 30, filed in support of this

motion.)  QC Energy Resources' confidential information affords it a competitive advantage in the industry, and the continued confidentiality of such information is essential to QC Energy Resources.  (McAvoy Aff. ¶ 18)  The Confidential Information derives economic value from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use.  (*Id*.)  Further, QC Energy Resources takes reasonable measures to maintain its secrecy, such as restricting access to such information and requiring affiliates to sign confidentiality agreements. (*Id*. ¶ 19)

During the term of the Contractor Agreement, Lucky Cousins requested numerous and extensive financial concessions to support its operations.  The financial concessions granted by QC Energy Resources included, without limitation, increased revenue splits, equipment rental discounts, reimbursement of expenses, and other cash assistance totaling about $1,060,000.  (*Id.* ¶ 21)  QC Energy Resources also loaned Lucky Cousins $265,000 so it could satisfy past due payroll taxes.  (*Id.* ¶ 24)  Lucky Cousins still owes QC Energy Resources over $125,000 on the principal balance of the loan (with interest) in addition to other amounts owed under the Contractor Agreement totaling about $500,000 as of April 30, 2016.  (*Id.* ¶ 33)

On or about March 3, 2016, Lucky Cousins advised QC Energy Resources that Lucky Cousins would not be able make payroll for the week of March 7, and it requested a $35,000 advance to meet this obligation.  (*Id.* ¶ 27)  At the time, Lucky Cousins already was in arrears for amounts due under the Contractor Agreement, not including the loan to Lucky Cousins.  (*Id.* ¶ 28)  As yet unaware of Lucky Cousins and its President, Givo Younani's, intentional breaches of the Contractor Agreement and their attempts to shift QC Energy Resources customers to a competing business, QC Energy Resources initially agreed to the advance.  (*Id.*)

On or around March 4, 2016, Mr. Younani visited a vehicle dealership in Texas to purchase equipment for a trucking company other than Lucky Cousins.  (*Id*. ¶ 29)  Mr. Younani knew that the vehicle dealership's representatives were aware (either themselves or through the dealership's finance company) of Mr. Younani's position with Lucky Cousins and its relationship with QC Energy Resources.  Therefore, Mr. Younani advised the vehicle dealership's representatives that the purchase was to be handled secretly.  (*Id.*)

On or about March 7, 2016, after learning of Mr. Younani's attempt to conceal his efforts to purchase equipment for a secret trucking company, QC Energy Resources questioned Mr. Younani, who denied any involvement with a trucking company other than Lucky Cousins.  (*Id.* ¶ 30)  QC Energy Resources investigated further and confirmed it was Mr. Younani who attempted to purchase the vehicles.  (*Id*.)  On further questioning, Mr. Younani admitted his involvement in establishing Skyline Transport.  (*Id.*)  In fact, Mr. Younani made the last of his numerous requests to QC Energy Resources for financial concessions in favor of Lucky Cousins *after* he had established Skyline Transport to compete with QC Energy Resources.  (*Id*. ¶ 31)

On March 8, 2016, QC Energy Resources notified Lucky Cousins of QC Energy Resources' immediate termination of the Contractor Agreement.  (*Id.* ¶ 32)  QC Energy Resources also cancelled its $35,000 wire transfer to fund Lucky Cousins' payroll obligations.  (*Id.*)  QC Energy Resources terminated the Contractor Agreement pursuant to Section 16(a)(2) as a result of Lucky Cousins' intentional misconduct and fraudulent acts, and pursuant to Section 16(a)(3) as a result of Lucky Cousins' insolvency.  (*Id.* at Ex. 6)

Mr. Younani formally established his competing trucking company, Skyline Transport, on February 24, 2016, and it was granted DOT motor carrier operating authority on April 6.  (*Id.* ¶ 34)  Skyline Transport is a direct competitor of Counter-Plaintiffs.  (*Id.*; Schrader Aff. ¶ 12)

Skyline Transport operates from the same terminal in New Philadelphia, Ohio as Lucky Cousins operated since 2014 while performing services under the Contractor Agreement. (McAvoy Aff. ¶ 35; Schrader Aff. ¶ 14) Skyline Transport has the same principals as Lucky Cousins, including Mr. Younani, has the same day-to-day operations, uses many of the same trucks, and has the same drivers as when Lucky Cousins performed services for QC Energy Resources and its customers. (McAvoy Aff. ¶ 36; Schrader Aff. ¶ 13) Skyline Transport provides transportation services hauling crude oil for QC Energy Resources' customer Chesapeake Energy, which is the same work for the same QC Energy Resources customer that Lucky Cousins performed under the Contractor Agreement. (McAvoy Aff. ¶ 38; Schrader Aff. ¶ 27)

### III.    LEGAL STANDARDS FOR INJUNCTIVE RELIEF

"To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Rather, the court may issue a preliminary injunction if it determines that the evidence establishes: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest." *Id.* (citing *Church v. City of Huntsville*, 30 F.3d 1332, 1341-42 (11th Cir. 1994)).

Florida federal courts routinely enforce restrictive covenants by granting injunctive relief to enjoin a party's continuing breach of a non-compete agreement. *See, e.g.*, *Technomedia Solutions, LLC v. Scopetto*, 2013 WL 6571558, at *16-*18 (M.D. Fla. Dec. 13, 2013); *Milner Voice & Data, Inc. v. Tassy*, 377 F. Supp. 2d 1209, 1216-17 (S.D. Fla. 2005); *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1309-10 (S.D. Fla. 2004); *N. Am. Prods. Corp. v. Moore*, 196 F.

Supp. 2d 1217, 1220-22 (M.D. Fla. 2002); *see also* Fla. Stat. § 542.335(1)(j) ("A court shall enforce a restrictive covenant by any appropriate and effective remedy, including . . . temporary and permanent injunctions."). Immediate injunctive relief is generally the proper remedy, and "[i]t truly can be said in this type of litigation that relief delayed is relief denied." *Capraro v. Lanier Bus. Prods., Inc.*, 466 So. 2d 212, 213 (Fla. 1985); *see also Sun Elastic Corp. v. O.B. Indus.*, 603 So. 2d 516, 517 (Fla. 3d DCA 1992) ("[A] trial court is required to enjoin the violation of a noncompetitive agreement which is reasonable as to its duration and geographical limitation."); *U.S. Floral Corp. v. Salazar*, 475 So. 2d 1305, 1306 (Fla. 3d DCA 1985) (noting injunctive relief is the "favored remedy" in non-compete cases).

## IV.    DISCUSSION

### A.    QC Energy Resources will prevail on its claim for breach of the restrictive covenant.

Under Florida Statute § 542.335, restrictive covenants are enforceable if an employer can prove: (1) the existence of one or more legitimate business interests justifying the restrictive covenant; and (2) that the contractually specified restraint is reasonably necessary to protect the interests of the employer. *See, e.g., Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009); *Autonation*, 347 F. Supp. 2d at 1304. Protectable business interests include, but are not limited to, an interest in protecting: (1) trade secrets; (2) valuable confidential information that does not otherwise qualify as a trade secret; (3) substantial relationships with prospective or existing customers; and (4) customer goodwill. Fla. Stat. § 542.335(1)(b). Restrictive covenants must be construed in favor of providing reasonable protection to all legitimate business interests. *Id.* § 542.335(1)(h). Courts "shall not employ any rule of contract construction that requires the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter of the contract." *Id.*

QC Energy Resources is likely to succeed on its counterclaim for breach of the restrictive covenant because the covenant is enforceable, and there is no question that Counter-Defendants are violating the covenant by competing with QC Energy Resources.  The restrictive covenant is enforceable because it is justified by several legitimate business interests, and the covenant is reasonable in location, line of business, and duration.  *See* Fla. Stat. § 542.335(1).

QC Energy Resources has a legitimate business interest in protecting the substantial investment it makes in its business, its independent contractor affiliates, including Lucky Cousins, its affiliate relationships, its customer relationships and goodwill, and its confidential information.  (Troy Aff. ¶¶ 10-22)  Engaging and retaining qualified affiliates is essential to QC Energy Resources' business and provides the advantages of flexibility in cost structure and hauling capacity with reduced capital requirements.  (*Id.* ¶ 10)  QC Energy Resources derives a substantial part of its revenue from the use of independent contractor affiliates, and QC Energy Resources has a legitimate interest in ensuring that its affiliates have the necessary resources and proper training to provide safe, reliable transportation services to QC Energy Resources' customers.  (*Id.* ¶¶ 10 & 11)

It is not uncommon for QC Energy Resources to engage independent contractor affiliates that do not have extensive resources and infrastructure (such as back office operations and support) or customer relationships and industry experience.  (*Id.*¶ 12)  Trucking companies of the size that typically join Quality Carriers and QC Energy Resources as affiliates often do not have an ability on their own as stand-alone trucking companies to develop or maintain business relationships with large customers because of a lack of experience, reputation, capacity, or other factors that allow Quality Carriers and QC Energy Resources to develop and maintain such customer relationships.  (*Id.* ¶ 17)  QC Energy Resources provides its affiliates with valuable

resources and support that are critical to their success.  (McAvoy Aff. ¶¶ 11, 16 & 17; Schrader Aff. ¶ 30)  In exchange, QC Energy Resources asks its affiliates to enter agreements that include restrictive covenants to protect QC Energy Resources' investment in affiliates and its customer relationships. (Troy Aff. ¶¶ 20-22)

Lucky Cousins was formed in 2012 and received its DOT operating authority in 2013. (McAvoy Aff. ¶ 6)  In 2013, Lucky Cousins was hired as a QC Energy Resources sub-hauler. (*Id.* ¶ 7 & Ex. 1)  By contrast, QC Energy Resources' parent company, Quality Distribution, traces its history to 1913, and the Quality Distribution companies have decades of transportation experience.  (Troy Aff. ¶¶ 4-6)  The Contractor Agreement provided Lucky Cousins with the benefit of that experience by granting it valuable rights, such as the: (a) right to operate under QC Energy Resources' DOT operating authority and insurance coverage; (b) right to operate under QC Energy Resources' safety, incident response, and claims management programs; (c) nonexclusive use of QC Energy Resources' name and service mark; (d) use of QC Energy Resources' proprietary transportation management system; (e) use of American Petroleum Institute ("API") approved policies and procedures that were required to secure hauling work for Chesapeake Energy; and (g) the opportunity to lease equipment, such as tractors, trailers, and accessories from QC Energy Resources.  (McAvoy Aff. ¶ 11; Schrader Aff. ¶ 30)

QC Energy Resources also provided Lucky Cousins with extensive financial concessions, including generous revenue splits, equipment rental discounts, expense reimbursement, and other cash assistance of about $1,060,000.  (McAvoy Aff. ¶¶ 9 & 21)  The restrictive covenant is a reasonable means of protecting QC Energy Resources' substantial investment in Lucky Cousins and other affiliates.  *See, e.g.*, *Milner*, 377 F. Supp. 2d at 1218; *Balasco v. Gulf Auto Holding, Inc.*, 707 So. 2d 858, 860 (Fla. 2d DCA 1998) (finding a protectable business interest where the

testimony showed that "Courtesy hires personnel with little or no sales experience and invests considerable money and time to teach them the Courtesy way of selling cars").

QC Energy Resources also has an interest in protecting its valuable trade secrets and confidential business information.  Lucky Cousins had access to a variety of QC Energy confidential information, such as information concerning: (a) pricing and proprietary pricing models and methodologies, including QC Energy Resources' most aggressive rates; (b) customer lists and contact information; (c) customer relationship management data (including sales reports, customer revenue activity, sales pipeline reports, and market research); (d) API-approved affiliate policies and procedures, including best practices and customer requirements relating to loading, unloading, hauling, and safety; and (e) QC Energy Resources' proprietary customer billing and affiliate compensation system.  (McAvoy Aff. ¶¶ 16-17; Schrader Aff. ¶ 30)

QC Energy Resources considers much of this information trade secrets because it derives economic value from not being generally known or ascertainable by proper means, and the information is subject to reasonable efforts to maintain its secrecy, such as the use of confidentiality provisions in QC Energy Resources' contractor agreements.  (McAvoy Aff. ¶¶ 18 & 19); *see also* Fla. Stat. § 688.002.  QC Energy Resources provided Lucky Cousins and its President, Givo Younani, access to the confidential information because they executed the Contractor Agreement that included a confidentiality provision and restrictive covenant.  (*Id.* ¶ 20)  QC Energy Resources would not have disclosed this information to Lucky Cousins and Mr. Younani without these protections.  (*Id.*)

Regardless of whether the Court determines that all of the QC Energy Resources information made available to Lucky Cousins and Mr. Younani is a trade secret, there can be no dispute that the information constitutes valuable confidential business information protectable

under Florida's non-compete statute.  *See Proudfoot*, 576 F.3d at 1234 (finding a legitimate business interest where the former employee had access to "pricing information . . . . [and] was exposed to Proudfoot's methodology for providing . . . services as well as to Proudfoot's products, offerings and tools"); *Autonation*, 347 F. Supp. 2d at 1305 (finding a legitimate business interest in confidential information comprising the plaintiff's "best practices").  The value of this information is evidenced by the fact that, among other things, Lucky Cousins could not have performed work for Chesapeake Energy without access to API-approved policies and procedures, like those received from QC Energy Resources.  (Schrader Aff. ¶ 30)

Lucky Cousins' work for Chesapeake Energy is another example of legitimate business interests underlying the restrictive covenant—QC Energy Resources' substantial relationships with existing and prospective customers and its customer goodwill.  "There is little question under Florida law that an employer has a legitimate business interest in prohibiting solicitation of its customers with whom the employee has a substantial relationship."  *N. Am. Prods. Corp.*, 196 F. Supp. 2d at 1228 ("Where an employee, as here, gains substantial knowledge of his former employer's customers, their purchasing history, and their needs and specifications it follows that the employer has a legitimate business interest under the statute.").  This is true even where the former employee was responsible for securing the customer's business.  *Hilb Rogal & Hobbs of Fla., Inc. v. Grimmel*, 48 So. 3d 957, 961 (Fla 4th DCA 2010).

QC Energy Resources entered a Master Service Agreement with Chesapeake more than two years before entering the Contractor Agreement with Lucky Cousins and has done business with Chesapeake Energy in several states.  (Troy Aff. ¶ 18; McAvoy Aff. ¶ 13)  According to Lucky Cousins, the gross revenue derived from work for Chesapeake at one location in Texas was nearly a million dollars per month.  (Dkt. 18 ¶¶ 34 & 35)  QC Energy Resources estimates

that since termination of the Contractor Agreement, Skyline Transport's work for Chesapeake Energy in the Utica shale region is generating about $27,000 per week in revenue for Skyline Transport.  (Schrader Aff. ¶ 26)  This is precisely the sort of substantial customer relationship that restrictive covenants are meant to protect.  Lucky Cousins' apparent claim that QC Energy Resources could only secure continued work from Chesapeake Energy as a result of Lucky Cousins' involvement does not change the analysis or QC Energy Resources' right to enforcement of the restrictive covenant.  (Dkt. 18 ¶ 50); *Grimmel*, 48 So. 3d at 961.

Lucky Cousins' amended complaint makes the incredible claim that "[t]here are no substantial client or customer relationships in the energy transportation industry" in part because customers are secured through a competitive bidding process.  (Dkt. 18 ¶¶ 151 & 152)  However, the work that Lucky Cousins performed in Ohio for Chesapeake Energy was not awarded through bidding but instead came directly through QC Energy Resources' existing relationship with Chesapeake Energy.  (Schrader Aff. ¶ 8)  QC Energy Resources routinely establishes long-term relationships with its customers.  (Troy Aff. ¶ 16).  Lucky Cousins' allegation directly contradicts the Contractor Agreement in which Lucky Cousins expressly "acknowledge[d] and agree[d] that the provisions of [the restrictive covenant] are reasonably necessary to protect the business, goodwill, and other proprietary interests of [QC Energy Resources],…"  (McAvoy Aff. at Ex. 2 § 19)  Lucky Cousins also acknowledged the substantial value of relationships in the industry when it entered a Customer Rights Acquisition Agreement with QC Energy Resources pursuant to which Lucky Cousins received $125,000 for customer relationships that it claimed to have developed with Dupre´ Logistics, LLC and Continental Refining Company.  (McAvoy Aff. ¶ 22); *see also Avalon Legal Info. Servs., Inc. v. Keating*, 110 So. 3d 75, 82 (Fla. 5th DCA 2013)

(finding a legitimate business interest where the plaintiff paid $200,000 for the defendant's customer relationships and goodwill).

The need for restrictive covenants is highlighted by the facts of this case. QC Energy Resources trusts affiliates to interact with customers, including customer representatives who have authority to select transportation service providers. (Troy Aff. ¶ 19)  Absent a restrictive covenant, there is a risk that affiliates will exploit QC Energy Resources' customer relationships. (*Id.* ¶ 20-22).  That is exactly what happened here.  Lucky Cousins and its President, Givo Younani, established a competing business while Lucky Cousins was an affiliate of QC Energy Resources and then, through Skyline Transport, began competing while the Contractor Agreement was still in effect.  (McAvoy Aff.  ¶¶ 30; Schrader Aff. ¶ 10)  Just days after termination of the Contractor Agreement, QC Energy Resources personnel observed Lucky Cousins changing signage at its terminal location and on its trucks to display Skyline Transport's name, logo, and DOT number.  (*Id.* ¶¶ 15 & 16)  Skyline Transport has continued the same day-to-day operations out of the same terminal location as when Lucky Cousins performed transportation services for QC Energy Resources and its customers.  (*Id.* ¶¶ 14-19)  On several occasions, QC Energy Resources personnel have photographed and observed Skyline Transport trucks hauling to or from the same customer locations as Lucky Cousins did for QC Energy Resources. (*Id.* ¶¶ 19-25)

Lucky Cousins' amended complaint admits that Mr. Younani began preparing to compete with QC Energy Resources before termination of the Contractor Agreement when he established Skyline Transport in February 2012.  (Dkt. 18 ¶ 112)  Counter-Defendants began soliciting prospective customers prior to termination of the Contractor Agreement.  (Schrader Aff. ¶ 10)  Specifically, in or around November 2015, a Marathon Petroleum Corporation representative

told QC Energy Resources that until certain pipeline construction work was complete, QC

Energy Resources would be asked to begin hauling Marathon crude oil loads from the UEO

facility in Scio, Ohio to Marathon's refinery in Canton, Ohio.  (*Id.* ¶ 9)  In February of this year,

Marathon told QC Energy Resources that Lucky Cousins employee Mathew Hart contacted

Marathon to solicit hauling work from Marathon on behalf of Skyline Transport, including the

work that QC Energy Resources previously discussed with Marathon.  (*Id.* ¶ 10)  QC Energy

Resources maintains that it lost the Marathon hauling work and other customer work out of the

UEO facility as a result of Counter-Defendants' activities.  (*Id.* ¶ 28)

     Not only is the restrictive covenant in the Contractor Agreement supported by several

legitimate business interests, its limitations also are reasonable in scope.  The geographic

limitation covers all of the United States and Canada, which is reasonable in light of the fact that

Quality Carriers has over 100 terminals throughout the United States and in Canada and Mexico,

and QC Energy Resources has had terminals or other operations in eleven states.  (Troy Aff. ¶¶ 6

& 9)  Lucky Cousins' First Amended Complaint discusses QC Energy Resources' operations in

Oklahoma, Texas, Wyoming, and Ohio, including worked performed by Lucky Cousins for QC

Energy Resources in these states.  (Dkt. 18 ¶¶ 22, 28, 47 & 50)  Lucky Cousins also performed

services for QC Energy Resources, Quality Carriers, and Quality Distribution subsidiary Boasso

America Corporation in other states.  (McAvoy Aff. ¶ 13)  This wide swath of activities justifies

the geographic scope of the restrictive covenant. *Proudfoot*, 576 F.3d at 1237-39 (upholding a

restrictive covenant that applied to all of the U.S. and Canada); *PartyLite Gifts*, 895 F. Supp. 2d

at 1226 ("The non-compete provision is also reasonable in geographic scope to the extent it is

construed to prohibit MacMillan from competing with PartyLite only in North America.").

The restrictive covenant also is reasonable as to the business activities that it proscribes. The restrictive covenant applies to specific services—transportation, transloading, logistics services, disposal, or freight forwarding, shipping, or brokerage services in specific industries: the upstream or midstream energy industry and any Chemical Business.  (McAvoy Aff. at Ex. 2 § 19)  The fact that a restrictive covenant, such as the one in this case, permits an enjoined party to provide other services within the same industry, or any service in a different industry, weighs in favor of finding that the covenant is reasonable.  *See PartyLite Gifts*, 895 F. Supp. 2d at 1226 ("The non-compete clause in the Leader Agreement is expressly limited to 'selling, reselling, promoting products, or actively representing other direct sales companies that are similar to or competitive with the Company' during the term of the Leader Agreement.  MacMillan cannot reasonably challenge the scope or duration of this restrictive covenant to the extent it applies only to competing companies."); *Keating*, 110 So. 3d at 82 (finding that a restrictive covenant was reasonable where the party remained free to provide other services in the same industry).

As to duration, the restrictive covenant precludes competitive activities for two years following termination, which falls within the time frame that is presumed not unreasonable under Fla. Stat. § 542.335(1)(d).  QC Energy Resources terminated the Contractor Agreement on March 8, 2016 after discovering that Lucky Cousins and Mr. Younani breached the Contractor Agreement by establishing a competing business and concealing their efforts to compete through Skyline Transport, and based on Lucky Cousins' insolvency.  (McAvoy Aff. ¶¶ 27-33)

On or about March 3, 2016, Mr. Younani contacted QC Energy Resources to request a $35,000 advance because Lucky Cousins could not meet payroll.  (*Id.* ¶ 27)  At the time, Lucky Cousins already was in arears for amounts owed to QC Energy Resources under the Contractor Agreement, not including the approximately $125,000 principal balance (with interest) due on

the loan from QC Energy Resources that Lucky Cousins needed to pay overdue payroll taxes. (*Id*. ¶¶ 24 & 28)  Before its March 3 request for an advance, Lucky Cousins had repeated problems making payroll.  (Schrader Aff. ¶ 6)  Despite substantial assistance from QC Energy Resources, Lucky Cousins was insolvent prior to termination of the Contractor Agreement.

QC Energy Resources initially agreed to Lucky Cousins' request for a $35,000 advance. (McAvoy Aff. ¶ 28)  But after Lucky Cousins made its request, QC Energy Resources learned Mr. Younani had visited a vehicle dealership in Texas to purchase equipment for Skyline Transport.  (*Id*. ¶¶ 29 & 30)  Mr. Younani had advised the vehicle dealership's representatives that the purchase was to be handled secretly.  (*Id*. ¶ 29)  To make matters worse, when QC Energy Resources questioned Mr. Younani about his involvement with another trucking company, Mr. Younani initially lied about the matter before finally admitting his involvement with Skyline Transport.  (*Id*. ¶ 30)  In light of Lucky Cousins' financial condition, Mr. Younani's clandestine efforts to begin competing with QC Energy Resources while Lucky Cousins was an affiliate of QC Energy Resources and before requesting a $35,000 payroll advance for Lucky Cousins, combined with Mr. Younani's lack of candor regarding the matter, QC Energy Resources was left with no choice but to cancel the Lucky Cousins payroll advance and terminate the Contractor Agreement.  As it was permitted to do under the Contractor Agreement, QC Energy Resources withheld the final two weekly payments to Lucky Cousins as credit towards amounts owed by Lucky Cousins to QC Energy Resources under the Contractor Agreement and the Note.  (McAvoy Aff. at Ex. 2, Contractor Agreement § 8 ("In addition, [QC Energy Resources] may offset and deduct from any payments due to [Lucky Cousins] hereunder any amounts due it by [Lucky Cousins], whether under this Agreement or otherwise.")).

The restrictive covenant is supported by several legitimate business interests that include protecting QC Energy Resources' investments in its business and affiliate relationships, its confidential business information and trade secrets, and its relationships and goodwill with existing and prospective customers.  The restrictive covenant is reasonable in geographic scope, duration, and line of business and is, therefore, enforceable.  There is no question that Counter-Defendants have and are continuing to breach the restrictive covenant by performing work for QC Energy Resources customer Chesapeake Energy and through their solicitation of work from Marathon.  QC Energy Resources properly terminated the Contractor Agreement based on Lucky Cousins' intentional misconduct, fraudulent acts, and insolvency.  As a result, QC Energy Resources is likely to succeed on the merits of its claim for breach of the restrictive covenant.

**B.      QC Energy Resources will suffer irreparable injury absent injunctive relief.**

Once a legitimate business interest is established, irreparable injury must be presumed. Fla. Stat. § 542.335(1)(j) ("The violation of an enforceable restrictive covenant creates a presumption of irreparable injury."); *Autonation*, 347 F. Supp. 2d at 1304 ("[W]hen the employer establishes a legitimate business interest, irreparable injury must be presumed."); *N. Am. Prods. Corp.*, 196 F. Supp. 2d at 1230.  "[U]se of specific trade secrets, customer lists, or direct solicitation of existing customers shall be presumed to be an irreparable injury and may be specifically enjoined."  Fla. Stat. § 542.33(2)(a).  "[I]t is not necessary for a company to have a contract with its customers in order to establish that the company has been or will be damaged by the solicitation of its customers."  *Technomedia Sols.*, 2013 WL 6571558, at *16.

The presumption of irreparable harm arises in part "because of the inherently difficult task of determining just what damage is actually caused by the . . . breach of [a restrictive covenant]."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555, 1559

(S.D. Fla. 1992); *see also N. Am. Prods. Corp.*, 196 F. Supp. 2d at 1231 ("Plaintiff's argument that there is no irreparable harm because Plaintiff's injuries, if any, are subject to a monetary judgment, is equally without merit and has been rejected by other courts, where, as here, there is a statutory presumption of irreparable harm.").

The presumption of irreparable harm arises because, as discussed above, the restrictive covenant is supported by legitimate business interests, it is reasonable in scope, and Counter-Defendants are violating the covenant by competing with QC Energy Resources.  Without an injunction, Counter-Defendants will continue competing with QC Energy Resources while utilizing its confidential information and trade secrets.  Lucky Cousins' and Mr. Younani's knowledge of QC Energy Resources' confidential information, and Skyline Transport's access to this information through Lucky Cousins and Mr. Younani, provides Lucky Cousins and Skyline Transport with a substantial unfair benefit and unfair competitive advantage in operating a competing transportation business in the Utica shale region and elsewhere, including specifically hauling for Chesapeake Energy and other QC Energy Resources customers.  (McAvoy Aff. ¶¶ 44-46; Schrader Aff. ¶ 31)  Injunctive relief is the only means for stopping irreparable harm to QC Energy Resources.  Lucky Cousins acknowledged as much in the Contractor Agreement where it agreed that "a breach of the covenants, agreements, obligations, and restrictions contained herein would result in irreparable and continuing harm to [QC Energy Resources]," and QC Energy Resources "shall be entitled to injunctive relief." (McAvoy Aff. at Ex. 2 § 19)

An injunction is also appropriate because at this stage of the litigation, QC Energy Resources' monetary damages are not readily quantifiable and, as such, there is no adequate remedy at law.  QC Energy Resources' damages cannot be measured by simply examining Skyline Transport's current or projected revenues in part because the revenues are variable and

therefore difficult to predict.  To illustrate, over the last few years, the overall volume of crude

oil hauling work for Chesapeake Energy has varied significantly depending on energy market

conditions.  (Schrader Aff. ¶ 29)  And Chesapeake Energy typically has divided its crude oil

hauling work between several transportation companies in varying proportions.  (*Id.*)

Moreover, without access to substantial support from QC Energy Resources, the services

offered by Skyline Transport will differ from the services rendered by Lucky Cousins as an

affiliate of QC Energy Resources.  These differences will invariably impact Skyline Transport's

revenues and future success in an amount that cannot presently be quantified.  *Hagerty*, 808 F.

Supp. at 1559 ("Merrill Lynch's reputation, services and products were among the best in the

industry . . . . these qualities will [undoubtedly] differ in some respects, and these differences

[undoubtedly] will impact Defendant's future success.").  As a result, even if the presumption of

irreparable harm did not apply, a preliminary injunction would still be appropriate because

absent such relief, QC Energy Resources would be left without an adequate remedy at law.

## C.    The balance of hardships favors QC Energy Resources.

Without an injunction, QC Energy Resources faces irreparable harm from Counter-

Defendants' continued competition, solicitation of current and prospective customers, and use of

QC Energy Resources' confidential information and trade secrets.  *See, e.g.*, *Technomedia Sols.*,

2013 WL 6571558, at *16; *Autonation*, 347 F. Supp. 2d at 1308; *N. Am. Prods. Corp.*, 196 F.

Supp. 2d at 1231.  In contrast to the irreparable harm faced by QC Energy Resources, the only

harm faced by Counter-Defendants is that they will be enjoined from engaging in activities that

they have already agreed not to perform.  *See Autonation*, 347 F. Supp. 2d at 1308.

("[C]onsidering that O'Brien agreed to the Non–Compete Agreement and that such agreement

was a condition of O'Brien's compensation and employment with AutoNation, the Court

considers that the relative harm between the parties weighs in favor of issuing an injunction."). And any alleged hardship is mitigated by the fact that the restrictive covenant is narrowly tailored to specific activities in specific industries— transportation, transloading, logistics services, disposal, or freight forwarding, shipping, or brokerage services in the upstream or midstream energy industry and any Chemical Business.  (McAvoy Aff. at Exh. 2 § 19)

To the extent Counter-Defendants cite to economic hardship as a justification for denying an injunction, the Eleventh Circuit has rejected as "specious" the argument that any potential losses to the movant should be considered in light of the relative size and resources of the parties. *See Ferrero*, 923 F.2d at 1449.  In any event, courts are precluded from considering "individualized economic or other hardship that might be caused to the person against whom enforcement is sought."  Fla. Stat. § 542.335(1)(g); *see also Technomedia Sols.*, 2013 WL 6571558, at *17; *N. Am. Prods. Corp.*, 196 F. Supp. 2d at 1231.  For at least these reasons, the balance of hardships weighs in favor of granting injunctive relief.

**D.    The public interest favors granting injunctive relief.**

"Under Florida law, the public has an interest in the enforcement of restrictive covenants."  *Technomedia Sols., LLC*, 2013 WL 6571558, at *17; *see also 7-Eleven, Inc. v. Kapoor Bros. Inc.*, 977 F. Supp. 2d 1211, 1230 (M.D. Fla. 2013) ("A preliminary injunction enforcing the restrictive covenants will serve the public interest, because enforcement of a valid restrictive covenant encourages parties to adhere to contractual obligations.").  "This interest is particularly strong with respect to non-compete agreements, as the Florida Legislature has determined that the enforcement of such agreements is in the public's best interest."  *Pitney Bowes Inc. v. Acevedo*, 2008 WL 2940667, at *6 (S.D. Fla. July 28, 2008) ("The public has a cognizable interest in the protection and enforcement of contractual rights.").

The public interest will be served by granting an injunction in this case, as that relief will uphold and promote the integrity and validity of binding contracts under Florida law.  An injunction will also serve the public interest by protecting QC Energy Resources' investment and interest in its business, in its affiliates and its relationships with them, in its customer relationships and goodwill, and in its confidential and proprietary business information that it uses as, and to become a more, profitable and efficient business enterprise.  The fact that Chesapeake Energy or other existing and potential customers might have to switch transportation companies does not make enforcement of the agreement against public policy.  *Grimmel*, 48 So. 3d at 962 ("The fact that the customers will have to use a different insurance broker does not make the enforcement of this agreement against public policy.").

"[T]he Florida Legislature has determined that in order to refuse enforcement of an otherwise enforceable restrictive covenant based on public policy considerations, the specified public policy must substantially outweigh the need to protect the legitimate business interest or interests established by the person seeking enforcement of the restraint."  *Autonation*, 347 F. Supp. 2d at 1308 (citing Fla. Stat. § 542.335(1)(i)).  Counter-Defendants can point to no such countervailing public policy in this case, and the public interest favors injunctive relief.[1]

**E.    The injunction should apply to Skyline Transport and Younani.**

The requested injunction should enjoin not only Lucky Cousins but also Givo Younani and Skyline Transport.  The plain language of the restrictive covenant clearly includes them.  *See also* Fed. R. Civ. P. 65(d)(2).  The restrictive covenant applies to Lucky Cousins as well as "its owners, managers, partners, directors, stockholders, and principal operating and financial

---

[1] If the Court finds the restrictive covenant overbroad in any respect, the Court should enforce the covenant after reforming it to the extent necessary to protect QC Energy Resources' legitimate business interests. *See* § 19 of the Contractor Agreement; Fla. Stat. § 542.335(1)(c); *PartyLite Gifts*, 895 F. Supp. 2d at 1227).

officer(s) (collectively, 'Contractor's Principals')," which includes Mr. Younani as the President of Lucky Cousins and a principal of Skyline Transport.  (McAvoy Aff. at Exh. 2 § 19)

The restrictive covenant precludes Lucky Cousins and its principals from competing "directly or indirectly."  (*Id.*)  Lucky Cousins and Mr. Younani cannot avoid the obligations of the covenant by competing through another entity, Skyline Transport, that is a mere continuation of Lucky Cousins  (Schrader Aff. ¶¶ 12-27)  Restrictive covenants cannot be subverted through use of a "straw man" to perform the proscribed activities.  *N. Am. Prods. Corp.*, 196 F. Supp. 2d at 1229 ("Florida courts have not hesitated to enforce non-compete agreements against both the employee who signed the agreement as well as against the corporation through which the ex-employee conducted business even where the employee was the only signatory to the non-compete agreement."); *W. Shore Rest. Corp. v. Turk*, 101 So. 2d 123, 127-28 (Fla. 1958) (enforcing a non-compete signed by the defendant but where the enjoined competing venture was purchased through a third-party); *Dad's Props., Inc. v. Lucas*, 545 So. 2d 926, 928-29 (Fla. 2d DCA 1989) ("[A]n injunction not only binds the parties . . . but also those identified with them in interest, in privity with them, represented by them or subject to their control.").

**F.    No bond, or at most a minimal bond, should be required.**

Courts may require a movant to post a security in an amount sufficient to pay damages sustained by a party found to have been wrongfully enjoined.  Fed. R. Civ. P. 65(c).  Courts have discretion to waive the bond requirement if the movant has demonstrated a high probability of succeeding on the merits or the enjoined party is unlikely to incur significant damages as a result of the injunction.  *See, e.g.*, *Tancogne v. Tomjai Enters. Corp.*, 408 F. Supp. 2d 1237, 1252 (S.D. Fla. 2005); *Baldree v. Cargill, Inc.*, 758 F. Supp. 704, 707 (M.D. Fla. 1990).  QC Energy Resources submits that no bond, or at most a nominal bond, should be required given that QC

Energy Resources has demonstrated a strong likelihood of success on the merits, Lucky Cousins

is unlikely to incur significant monetary losses, and QC Energy Resources is asking that Lucky

Cousins be enjoined from engaging in activities it has already agreed not to perform.

## V.    CONCLUSION

Counter-Plaintiffs respectfully request that the Court grant this motion and:

(a)      preliminarily enjoin Counter-Defendants, Lucky Cousins Trucking Inc., Givo
         Younani, and Skyline Transport Group, LLC, their officers, agents, servants,
         employees, and attorneys, and all persons or entities in active concert or
         participation with them who receive actual notice of the injunction by personal
         service or otherwise, from:

  (i)       engaging in, having a material interest in, providing financial or other
            assistance to, and/or providing transportation equipment to, a Competitive
            Business (as that term is defined in the Contractor Agreement);
  (ii)      requesting, inducing and / or advising persons to withdraw, curtail, or
            cancel their business with QC Energy Resources;
  (iii)     making inevitable and unauthorized use, disclosures and transfers of QC
            Energy Resources' Confidential Information to a Competitive Business (as
            those terms are defined and used in the Contractor Agreement);

(b)      order Counter-Defendants to return all of Counter-Plaintiffs' Confidential
         Information (as that term is defined and used in the Contractor Agreement);

(c)      award Counter-Plaintiffs their attorneys' fees and costs, and all other relief to
         which Counter-Plaintiffs are entitled at law or in equity.[2]

Dated:  June 21, 2016.                    */s/  Ernest J. Marquart*
                                          Ernest J. Marquart, Florida Bar No. 905860
                                          Jeffrey B. Fabian, Florida Bar No. 85868
                                          SHUMAKER, LOOP & KENDRICK, LLP
                                          101 East Kennedy Blvd., Ste. 2800
                                          Tampa, Florida 33602
                                          Telephone:  (813) 229-7600
                                          Facsimile: (813) 229-1660
                                          emarquart@slk-law.com
                                          jfabian@slk-law.com
                                          *Attorneys for Defendants and Counter-Plaintiffs*

---

[2] Pursuant to Local Rules 4.06(b)(1) and 4.05(b)(3), and this Court's Case & Trial Management Preferences,
Counter-Plaintiffs will email a proposed form of Order Granting Preliminary Injunction to Chambers.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 21, 2016, I electronically filed the foregoing with the Clerk

of the Court by using the CM/ECF system which will send a notice of electronic filing to all

counsel of record, including the following:

>Jonathan E. Pollard
>Pollard PLLC
>401 E. Las Olas Blvd. #1400
>Fort Lauderdale, FL  33301
>jpollard@pollardllc.com

>/s/  *Ernest J. Marquart*
>Attorney