**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**LUCKY COUSINS TRUCKING INC.,**

       Plaintiff,

v.

**CASE NO. 8:16-cv-866-T-26TGW**

**QC ENERGY RESOURCES**
**TEXAS, LLC and QC ENERGY**
**RESOURCES, LLC,**

       Defendants.
_____/

**QC ENERGY RESOURCES**
**TEXAS, LLC, QC ENERGY**
**RESOURCES, LLC, QC ENERGY**
**RESOURCES, INC. and**
**QUALITY CARRIERS, INC.,**

       Counter-Plaintiffs,

v.

**LUCKY COUSINS TRUCKING INC.,**
**GIVO YOUNANI and SKYLINE**
**TRANSPORT GROUP, LLC,**

       Counter-Defendants.
_____/

**COUNTER-DEFENDANTS' RESPONSE IN OPPOSITION TO**
**COUNTER-PLAINITFFS' MOTION FOR PRELIMINARY INJUNCTION**

Counter-Defendants, Lucky Cousins Trucking, Inc. ("LC"), Givo Younani ("Younani"), and Skyline Transport Group, LLC ("Skyline") (collectively "Counter-Defendants"), by and through their undersigned counsel and pursuant to Fed. R. Civ. P. 65, file this Response in Opposition to Counter-Plaintiffs' Motion for Temporary Injunctive Relief and in support state as follows:

## INTRODUCTION

Counter-Plaintiffs QC Energy Resources Texas, LLC, QC Energy Resources, LLC, QC Energy Resources, Inc., and Quality Carriers, Inc. (collectively "QCER") seek a preliminary injunction to enforce restrictive covenants that constitute illegal restraints of trade. Injunctive relief should be denied.

## FACTUAL BACKGROUND

LC is hauling company. Younani Decl. Ex. A, at ¶4. Its services include the transportation of energy products, chemicals, and water. Its specialty is hauling crude oil. *Id.* Younani is the President of LC. *Id.* Younani formed LC in 2011. *Id.* Between 2011 and 2013, LC was a successful independent hauling company. *See id.* It was not until 2013 that LC began sub-hauling for QCER. *Id.* at ¶5. Between 2013 and 2014, LC provided energy transportation services to QCER as a subhauler. *Id.* at ¶¶5-6. Based on LC's success in providing those services, in March 2014, LC entered into the Agreement with QCER to provide transportation services to QCER as a "preferred independent contractor", which QCER represented carried with it several distinct advantages. *Id.* at 13. Included within the Agreement at Paragraph 19 were the following restrictive covenants:

> During the Term [of the Contractor Agreement] and for a period of two (2) years thereafter, Contractor [LC] and its owners, managers, partners, directors, stockholders, and principal operating and financial officer(s) (collectively, "Contractor's Principals") shall not directly or indirectly: (i) engage in a Competitive Business, as

2

> hereinafter defined; (ii) have any material interest (whether as a proprietor, partner, shareholder, associate, or any type of principal or owner whatsoever) in any person, firm, partnership, joint venture, or other business entity (each, an "Entity") that is engaged in a Competitive Business (other than an ownership interest not exceeding 5% of a publicly held company); (iii) provide financial or other assistance, or act as an agent of, consultant for, or advisor to, any Entity that is, or becomes, engaged in a Competitive Business; or (iv) sell, lease or otherwise provide transportation equipment (e.g., tractors, trailers) to any Entity that is, or becomes, engaged in a Competitive Business.
>
> During the Term [of the agreement] and for a period of two (2) years thereafter, Contractor and Contractor's Principals shall not directly or indirectly: (i) request, induce or advise any person to withdraw, curtail or cancel their business with QCER [QC Energy Resources]; (ii) request, induce or advise any person employed by or under contract with QCER to terminate or breach the terms of such employment or contract.

The term "Competitive Business" is defined in the Contractor Agreement as:

> the management, ownership, or operation of, or connection in any manner with, within the continental United States or Canada, any business involving the provision of any of the following services with respect to the upstream or midstream energy industry and any Chemical Business: (i) transportation; (ii) transloading; (iii) logistics services; (iv) disposal; or (v) freight forwarding, shipping, or brokerage services.

A few months after LC signed the Agreement, one of QCER's customers, Chesapeake, began cancelling LC's transportation routes based on mistakes made by another one of QCER's contractors. DE 1 at ¶¶37-38. QCER subsequently replaced that contractor with LC. Chesapeake stated that it would maintain its relationship with QCER only if LC managed its project, to which QCER agreed. *Id.* at ¶¶42-47; Younani Decl. Ex. A, at ¶18.

In January 2016, QCER informed LC that there was pressure from QCER's private equity firm to shut down QCER's energy hauling business, which was less successful than its chemical hauling operation. DE 1 at ¶100; Younani Decl. Ex. A, at ¶¶24-25, 29. LC was entirely dependent on QCER for hauling assignments. Younani Decl. Ex. A, at ¶31. As such, a decision to terminate QCER's energy hauling operations would have left LC broke and out of work. *Id.* QCER employees continued to warn Younani that QCER might end its energy hauling operations, and, at the least, QCER would no longer guarantee loans for hauling equipment

3

purchases. *Id.* at ¶¶36-37. During this time, QCER attempted to recruit LC's managers to work for QCER. Chris Broussard, President of QC Energy Resources, LLC, informed Younani in February 2016 that an announcement as to the fate of QCER's energy transportation operations was imminent. *Id.* at ¶30.

In February 2016, Younani assisted in the formation of Skyline, which was established with the purpose of acquiring and leasing equipment to LC. *Id.* at ¶37, 40. Alternatively, in case QCER ended its energy hauling operations, Skyline could provide hauling services with its own equipment. *Id.* at ¶30. On March 8, 2016, after learning that Younani had shown interest in acquiring some hauling equipment, QCER terminated the Agreement with LC. *See* March 8, 2016 Letter Ex. B. QCER based the termination on LC's alleged intentional misconduct, fraudulent acts, and insolvency. *Id.* at 1. Immediately following the termination, QCER attempted to poach LC's staff by offering a position to LC's Ohio terminal manager and offering employment and signing bonuses to LC's drivers. Looney Decl. Ex. C, at ¶6. LC's terminal manager and drivers declined QCER's advances. DE 1 at ¶112.

As a result of QCER's poor business record with Chesapeake, Chesapeake has banned QCER from bidding on any oil hauling contracts associated with Chesapeake's Ohio terminal. Younani Decl. Ex. A., at ¶42; Looney Decl. Ex. C at ¶10. QCER also has closed its Ohio terminal. Younani Decl. Ex. A, at ¶42. Chesapeake has since awarded an oil hauling contract to Skyline. *Id.* at ¶41. Skyline's only terminal is in Ohio and its oil hauling contract with Chesapeake is Skyline's only current work. *Id*

**STANDARD**

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of preliminary injunctions. *See Ferrerro v. Assoc. Material, Inc.*, 923 F.2d 1441, 1448 (11th Cir. 1991) (federal

procedural law governs issuance of preliminary injunctions).  In order to secure a preliminary injunction, QCER must demonstrate the following: "(1) a substantial likelihood of success on the merits; (2) that they will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to Counter-Plaintiffs outweighs whatever damage the proposed injunction may cause LC, Younani, and Skyline; and (4) if issued, that the injunction would not be adverse to the public interest." *TransUnion Risk & Alternative Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 405 (11th Cir. 2015) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)) (applying Fed. R. Civ. Pro. 65 where an employer sought a preliminary injunction to prevent former employee from competing). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to the four requisites." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989); *see also TransUnion Risk*, 625 F. App'x at 405.

## MEMORANDUM OF LAW

**I. QCER DOES NOT HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.**

To succeed on the merits, QCER must (1) demonstrate that the restrictive covenants are enforceable and (2) defeat each of Counter-Defendants' affirmative defenses.[1] QCER fails on each of these fronts.

**A. The Restrictive Covenants are not Reasonably Necessary to Protect any Alleged Legitimate Business Interest**

---

[1] *See North Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1224-30 (M.D. Fla. 2002); *Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Co-op Productions, Inc.*, 479 F. Supp. 351, (N.D. Ga. 1979) *citing Canal Authority v. Callaway*, 489 F.2d 567 (5th Cir. 1974) ("On a motion for preliminary injunction, Plaintiffs must demonstrate a likelihood of success on the merits at trial as to asserted affirmative defenses, as well as to the elements of Plaintiffs' prima facie case.").

5

In order for QCER to enforce the restrictions at issue, QCER must "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1231 (11th Cir. 2009). Generally, a legitimate business interest takes the form of confidential information, substantial customer relationships or extraordinary training and education. *See* §542.335; *Hapney v. Central Garage, Inc.*, 579 So. 2d 127, 132 (Fla. 2d DCA 1991). A restrictive covenant may be no broader than is necessary to protect the legitimate business interest at issue. *See* §542.335(1)(c); *Shields v. Paving Stone Company, Inc.*, 796 So. 2d 1267, 1268-69 (Fla. 4th DCA 2001) (narrowing a non-solicitation clause where employer "did not provide sufficient evidence to support the overinclusive nature of the restrictive covenants"). Here, QCER has not sufficiently plead and proven legitimate business interests justifying an otherwise illegal restraint of trade and as a result the restrictions at issue are unenforceable. *See* §542.335(1)(b).

1. **QCER Has Not Established a Legitimate Business Interest in Investments in Its Affiliates or Training**

QCER alleges that it has a legitimate business interest in its investment in affiliates, such as LC. D.E. 24 at 10. QCER contends that LC operated under its authority using its equipment, name, and procedures. *Id.* at 11. In connection with its operations, QCER alleges that it provided Lucky "financial concessions," "revenue splits," "equipment rental discounts," "expense reimbursement," and unexplained "cash assistance." *Id.* This does not constitute a legitimate business under the Statute and relevant case law.

a. **By Its Very Nature QCER's Investment Interest Is Not Protectable**

First, QCER's claimed investment interest, by its very nature, is not the type of interest that can be protected through use of a restrictive covenant. QCER operates a hauling business. QCER has made the business decision to use contractors (affiliates like LC) as sub-haulers.

6

QCER has done this, ostensibly, because it is an advantageous business model and more cost effective than QCER hiring hundreds of additional employees, buying hundreds of additional trucks, and handling everything in-house. *See id.* at 10. This is a business decision. As part of its contractor relationship with LC, QCER had to pay LC for the work it performed. In some instances, QCER may have made financial concessions or reimbursed certain expenses. That is simply the nature of running a business. The investment at issue was QCER's investment in running its own business. There is nothing unique about this and nothing that constitutes a protectable business interest.

### b. QCER's Investment Interest Does Not Constitute Extraordinary Training

Knowing that its supposed investment interest is not protectable, QCER attempts classify this as something akin to an employer's investment in an employee's extraordinary training or education, which can be protected under Florida law. *Id.* To state the obvious, QCER compares apples to oranges. LC was never a QCER employee or anything comparable. But even viewing this through the framework of the relevant employee training case law, QCER's argument still fails. An investment in an employee's education or training is specialized or extraordinary only if it goes beyond what is "common or typical in the industry." *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1306 (S.D. Fla. 2004); *see also IDMWORKS, LLC v. Pophaly*, 2016 WL 3566867, at *7 (S.D. Fla. June 23, 2016) (same); *S. Wine & Spirits of Am., Inc. v. Simpkins*, 2011 WL 124631, at *4 (S.D. Fla. Jan. 14, 2011) (same). In the instant case, QCER has failed to proffer any evidence that its investment in its own business—via paying a subcontractor for work performed and making concessions to that subcontractor—goes beyond what is typical in the industry. What QCER deems an extraordinary investment in training seems par for the course (paying a subcontractor and making various business concessions). Anything that is common industry practice cannot constitute extraordinary training. *See, e.g., Passalacqua v. Naviant, Inc.*,

844 So.2d 792 (Fla. 4th DCA 2003) (training in generic industry practices is not a protectable interest). For this reason alone, QCER's argument fails.

### c. Counter-Defendants' Prior Industry Experience Defeats the Claimed Interest

Even if QCER's business investment in a subcontractor could constitute extraordinary or specialized training (and it does not), the argument still fails because Younani and LC had experience hauling prior to any affiliation with QCER. Younani started LC in 2011. Younani Dec. Ex. A, at ¶¶3-4. Prior to any affiliation with QCER, LC was a successful hauling company with over half a dozen customers. *Id.* at ¶4. Even if QCER made what they consider an investment in Younani and LC's training, that is not protectable because of Counter-Defendants' prior experience in the industry. Where the recipient of allegedly extraordinary or specialized training already had knowledge and experience in the industry, such training does not constitute a legitimate business interest. *See, e.g., Austin v. Mid State Fire Equip. of Cent. Fla., Inc.,* 727 So.2d 1097, 1098 (Fla. 5th DCA 1999) (no protectable interest in training or education where employee had extensive prior industry experience); *Passalacqua v. Naviant, Inc.,* 844 So.2d 792 (Fla. 4th DCA 2003) (finding no protectable interest training where employees had prior experience in making cold call sales and testified that the company's sales tactics were generic).

### d. QCER Cannot Explain How the Purported Interest Implicates Unfair Competition

QCER's argument fails because it cannot explain how LC's experience or purported training with QCER would allow LC to engage in unfair competition. "A legitimate business interest must represent an investment by the employer and must enable unfair competition if misappropriated." *IDMWORKS, LLC v. Pophaly*, 2016 WL 3566867, at *4 (S.D. Fla. June 23, 2016). QCER has not identified anything that LC learned while at QCER and that LC or Younani are now unfairly using against QCER. For example, QCER seems to suggest that it has

8

a protectable interest because it gave LC the right to operate under its name and insurance, use of its management system, use of American Petroleum Institute approved policies and procedures (which clearly are non-proprietary), opportunities to lease equipment, and various financial concessions. D.E. 24 at 11.[2] None of this threatens unfair competition. QCER cannot establish that enforcement of the Agreement would be "reasonably necessary to protect" them. *Concrete Surface Innovations, Inc. v. McCarty*, No. 610CV568ORL28GJK, 2010 WL 1930971, at *7 (M.D. Fla. May 13, 2010) (finding no protectable interest in "certification" that is only valid while an employee works at the plaintiff).

### e. QCER Offers No Authority in Support of its Position

The cases QCER cites on training are inapposite. In *Milner Voice & Data, Inc. v. Tassy*, 377 F. Supp. 2d 1209, 1218 (S.D. Fla. 2005), the plaintiff sent the defendant to formal training courses and provided in house training on specialized products with which the Defendant had no prior experience. In *Balasco v. Gulf Auto Holding, Inc.*, 707 So. 2d 858, 860 (Fla. 2d DCA 1998), the plaintiff hired "raw recruits" and put them through six months of sales training with both a full-time in house training manager and outside trainers. Neither of these cases applies. Beyond that, neither of these cases offers a particularly compelling articulation of the extraordinary training standard. Investment in an employee's training and development is only extraordinary when it exceeds "what is usual, regular common or customary in the industry." *Hapney v. Cent. Garage, Inc.*, 579 So.2d 127, 132 (Fla. 2d DCA 1991); *see also IDMWORKS, LLC v. Pophaly*, 2016 WL 3566867, at *7 (S.D. Fla. June 23, 2016) (same). Neither LC nor Younani ever were QCER employees. Younani Decl. Ex. A., at ¶¶4-14. QCER's investment was

---

[2] Payments due by QCER to LC under their contract cannot constitute a legitimate business interest. Even if they could, QCER's argument fails because QCER routinely breached that agreement by failing to pay Lucky monies due. *See* Younani Decl. Ex. A, at ¶¶11, 34, 47.

9

typical of the investment a contractor would make in a sub-contracted hauler. There is nothing extraordinary and nothing protectable about this.

### 2. *QCER's Relationships With Affiliates Are Not A Legitimate Business Interest*

QCER suggests that the restrictive covenants are necessary to protect its affiliate relationships. D.E. 24 at 10. QCER's argument strains credulity. In essence, QCER argues that it is important to its business model to lock-up affiliates and keep them out of the market. Protection of its affiliate relationships cannot constitute a legitimate business interest as QCER's goal here is to prevent ordinary competition. *Evans v. Generic Sol. Eng'g, LLC*, 178 So. 3d 114, 116 (Fla. 5th DCA 2015) (protection against ordinary competition is not a legitimate business interest).

### 3. *QCER Has Not Proven a Legitimate Interest in Customer Relationships or Goodwill*

Only "substantial relationships" with specific customers are protected as legitimate business interests. §542.335(1)(b)(3); *Litig. Sols., L.L.C. v. McGonigal*, 2010 WL 111822, at *3 (S.D. Fla. Jan. 11, 2010) ("Significantly, § 542.335, Florida Statutes, does not state that customer relationships generally qualify as legitimate business interests. Rather, the statute requires a showing of *substantial* relationships with *specific* customers."). "Although the relevant statute does not define the criteria for substantial relationships, an analysis of Florida case law reveals that a substantial relationship is more likely to exist where there is active, on-going business being conducted; exclusivity; a customer who cannot be easily identified by other competitors in the industry; and an expectation of continued business." *IDMWORKS, LLC v. Pophaly*, 2016 WL 3566867, at *5 (S.D. Fla. June 23, 2016); *see also Evans v. Generic Sol. Eng'g, LLC*, 178 So. 3d 114, 117 (Fla. 5th DCA 2015) (no substantial customer relationship where plaintiff never had

exclusive contract with customer at issue and did not have reasonable expectation of future business once its contract expired).

### a. QCER Fails the Basic Test for Substantial Customer Relationships

QCER cannot demonstrate that any substantial customer relationships are at issue. To be clear, QCER has put only two customers at issue: Chesapeake and Marathon. D.E. 24 at 10-11. QCER's relationship with Chesapeake was never a substantial customer relationship and is not protectable for a litany of reasons. QCER's relationship with Chesapeake was never an exclusive relationship. Younani Decl. Ex. A., at ¶41; *see also id.* at ¶¶ 15, 18. Chesapeake uses and has always used multiple hauling vendors. *Id.* Chesapeake's identity as a prospective customer within the industry is well known. *Id.* at ¶43. For these reasons alone, QCER cannot establish that its relationship with Chesapeake was substantial or protectable.

### b. Numerous Other Factors Weigh Against Finding Substantial Customer Relationships

Beyond failing under the basic framework, there are numerous other reasons why QCER's customer relationships were not substantial customer relationships. First, the Chesapeake relationship was fraught with problems. As a result of these problems, Chesapeake recently banned QCER from bidding on oil hauling contracts for a period of two years. *Id.* at ¶32; Looney Decl. Ex. C., at 10. Customer service problems alone can prevent a finding of a substantial customer relationship. *See, e.g.*, *TrueBlue, Inc. v. Dyn,* 2010 WL3565756, at *4 (M.D. Fla. Sept. 9, 2010) (denying motion for summary judgment on legitimate business interest where record contained evidence of customer dissatisfaction that weighed against finding substantial relationships). Second, the vast majority of work in the energy transport industry is acquired through a competitive bidding process. Younani Decl. Ex. A., at ¶¶ 6, 41; *see also id.* at 23, 27, 39, 42, 47. Where customers award work through competitive bidding, restrictive covenants are

11

unenforceable. *See Shields v. Paving Stone Co., Inc.*, 796 So. 2d 1267, 1269 (Fla. 4th DCA 2001) (restrictive covenants unenforceable where information on customers was publicly available, customer relationships were not exclusive and contracts were awarded through competitive bidding); *cf. Moon v. Med. Tech. Associates, Inc.*, 577 F. App'x 934, 936-37 (11th Cir. 2014) (vacating injunction in non-compete case and instructing Florida district court to consider the application of *Shields* on remand).

### c. Amount of Revenue is Irrelevant to Evaluating a Substantial Customer Relationship

The amount of revenue QCER generated from Chesapeake is irrelevant to the question of whether or not the relationship was substantial. That question depends on market dynamics, not revenue. *See, e.g.*, *IDMWORKS, LLC v. Pophaly*, 2016 WL 3566867, at *3 (S.D. Fla. June 23, 2016) (no substantial relationship because of market dynamics even where plaintiff derived $750,000 in revenue from customer at issue). On these facts, it is impossible for QCER to establish the existence of a substantial, protectable customer relationship.

### d. There is No Customer Goodwill to Protect

With respect to Marathon, QCER's argument fails for the same reasons. QCER basically alleges that it attempted to earn Marathon's business but was not successful in doing so. QCER speculates that it did not win Marathon's business because it lost the work to Counter-Defendants. Schrader Aff. at 3-4; Motion at 16. QCER admits that there is no active, on-going business being conducted; there is no exclusivity; and there is no expectation of continued business. Indeed, Marathon lost the bid on the project for which it was seeking subhaulers, so neither LC nor Skyline won the Marathon work.[3] The argument fails.

---

[3] This court has previously held that multiple layers of contractors and subcontractors militates against the finding of substantial, protectable relationships. *See Concrete Surface Innovations, Inc. v. McCarty*, 2010 WL 1930971, at *8 (M.D. Fla. May 13, 2010)

Plaintiff has not sufficiently pled and proved that it had substantial customer relationships that constitute a legitimate business interest. Ultimately, given that Chesapeake has banned QCER and Marathon does not work with QCER, there are no substantial customer relationships at issue and no customer goodwill in need of protection. *See, e.g.*, *Thyssenkrupp Elevator Corp. v. Hubbard*, 2013 WL 5929132, at *4 (M.D. Fla. Nov. 4, 2013) (no legitimate business interest in client goodwill where plaintiff failed to identify and facts or evidence in support of its assertion).

4. **QCER Has Not Proven a Legitimate Business Interest in Confidential Information**

QCER alleges that it provided Counter-Defendants confidential business information. Specifically, "pricing and proprietary models and methodologies, including QC Energy Resources most aggressive rates; (b) customer lists and contact information; (c) customer relationship management data (including sales reports, customer revenue activity, sales pipeline reports, and market research); d) API-approved affiliate policies and procedures, including best practices and customer requirements relating to loading, unloading, hauling, and safety; and e) QC Energy Resources' proprietary customer billing and affiliate compensation system." D.E. 24 at 12. QCER alleges that they consider such information either confidential information or trade secrets. The Court should not credit QCER's *ipse dixit* assertion.

   a. **QCER Has Not Identified Any Valuable Confidential Information**

In order for information to constitute a legitimate business interest, that information must be valuable, confidential information that is unique to the plaintiff and not otherwise available to other competitors in the industry. *See Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304

13

(S.D. Fla. 2004); *Anich Indus., Inc. v. Raney*, 751 So .2d 767, 771 (Fla. 5th DCA 2000). First, QCER's allegations are largely generic (*e.g.* references to proprietary models and methodologies). Generic allegations about confidential information do not establish a legitimate business interest. *See WellCare Health Plans, Inc. v. Preitauer*, 2012 WL 1987877, at *3 (M.D. Fla. May 23, 2012) report and recommendation adopted, 2012 WL 1987692 (M.D. Fla. June 4, 2012) (rejecting generic allegations of "confidential information" "business plans" and "formulas"). Second, Customer information does not constitute QCER's own confidential information because any competitor in the industry can gain access to the same customer information. *See, e.g.*, *Anich Indus., Inc. v. Raney*, 751 So. 2d 767, 771 (Fla. 5th DCA 2000) (no legitimate interest in customer information readily available to others in the industry). Third, American Petroleum Institute-approved polices, procedures and best practices are not confidential. The API makes its standards public. QCER's assertion to the contrary is absurd.

### b. QCER Cannot Explain How Use of Its Purportedly Confidential Information Threatens Unfair Competition

To be clear, QCER must articulate exactly how its methods or techniques are unique or proprietary and explain how Counter-Defendants could unfairly utilize that confidential information to compete against it. *See, e.g.*, *Passalacqua v. Naviant, Inc.*, 844 So. 2d 792, 796 (Fla. 4th DCA 2003) (no legitimate interest in confidential information where plaintiff failed to articulate how its methods were unique and how defendant could use that information against them in market to gain unfair advantage); *see also Thyssenkrupp Elevator Corp. v. Hubbard*, 2013 WL 5929132, at *5 (M.D. Fla. Nov. 4, 2013) ("Because ThyssenKrupp has failed to present any evidence showing that Hubbard was privy to information unique to its business or crucial to its success, the Court cannot conclude that ThyssenKrupp has met its burden of showing confidential information as a legitimate business interest"). QCER's argument fails.

## B. QCER Cannot Defeat Counter-Defendants' Affirmative Defenses.

Florida Statutes 542.335(g)(3), requires a court to consider affirmative defenses when determining the enforceability of restrictive covenants. In the instant case, Counter-Defendant's affirmative defenses directly bear upon QCER's likelihood of success on the merits. Therefore, QCER is not entitled to injunctive relief unless it can overcome each of the affirmative defenses at issue.

### 1. QCER Breached the Agreement First

QCER is not entitled to injunctive relief because of the doctrine of prior breach. A party cannot enforce an agreement if it is already in breach. *See Mattocks v. Black Entertainment Television, LLC*, 43 F. Supp. 3d 1311, 1319-20 (M.D. Fla. 2014) (*citing Indem. Ins. Corp of D.C. v. Caylao*, 130 So. 3d 783, 786 (Fla. 1st DCA 2014)) ("It is a fundamental principle of Florida contract law that a material breach by one party excuses performance by the other party.").

QCER wrongfully terminated the Agreement on March 8, 2016, based on allegations of LC's insolvency, "intentional misconduct", and "fraudulent acts." Those allegations were false, as LC was not insolvent when QCER terminated the Agreement and LC had not engaged in any intentional misconduct or fraudulent acts. Even if Skyline's current hauling for Chesapeake could constitute a violation of any enforceable restrictive covenant at issue, such hauling began after QCER terminated the Agreement. QCER's prior breach bars it from enforcing the restrictive covenants against LC, Younani, and Skyline.

### 2. QCER Prevented LC From Performing Under the Agreement

The affirmative defense of impossibility is available "where purposes for which the contract was made, have, on one side become impossible to perform." *Harvey v. Lake Buena Vista Resort, LLC*, 568 F. Supp. 2d 1354, 1367 (M.D. Fla. 2008). "The doctrine

15

of impossibility of performance should be employed with great caution if the relevant business risk was foreseeable at the inception of the agreement and could have been the subject of an express provision of the agreement." *Am. Aviation, Inc. v. Aero–Flight Serv., Inc.*, 712 So. 2d 809, 810 (Fla. 4th DCA 1998). Here, the risk that QCER would send LC on wild goose chases around the United States, that QCER would itself compete with LC for work, or that QCER would close its energy transportation business were not foreseeable risks. Any alleged failure to perform on the part of LC was due to QCER's actions.

### 3. QCER Has Unclean Hands

QCER also cannot overcome Counter-Defendants' affirmative defense of unclean hands. A party is not entitled to equitable relief when it comes to the court with unclean hands. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945) ("[The doctrine of unclean hands] closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."); *Manhattan Medicine Co. v. Wood*, 108 U.S. 218, 225 (1883) ("[H]e who seeks equity must present himself to the court with clean hands.").

QCER comes to the Court with unclean hands because it intentionally has engaged in a litany of wrongful and unfair business practices. Some instances of this conduct include the following: wrongfully withholding payments to LC; competing with LC; stripping LC's equity from hauling equipment; repeatedly sending LC to new hauling sites where no work materialized; misleading LC as to circumstances surrounding hauling contracts; and unilaterally setting contract prices with customers under which LC could not profit. *See generally* Younani Decl. Ex. A; DE 18 at 13-132; 173-243. Under these circumstances, QCER is not entitled to injunctive relief.

## II. THERE IS NO THREAT OF IRREPARABLE HARM

QCER has failed to demonstrate the threat of irreparable harm. A party seeking injunctive relief is entitled to a presumption of irreparable harm where there is breach of a valid restrictive covenant. *TransUnion*, 625 F. App'x at 406-07 ("A presumption of irreparable harm is not arbitrarily granted by Florida's statute, but is the logical consequence of the movant's prima facie showing, including its establishment of the covenant's reasonableness in protecting legitimate business interests at stake." (citation omitted)). Here, however, the restrictive covenants are illegal restraints of trade. Contrary to QCER's contention, QCER is not entitled to a presumption of irreparable harm. *See GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1337 (M.D. Fla. 2010) ("[Plaintiff] has not shown a substantial likelihood of success as to whether its restrictive covenants are enforceable or as to [defendant's] violations of those restrictive covenants. Therefore, no presumption of irreparable injury exists on this record.")

Instead, QCER must demonstrate irreparable harm that is "actual and imminent," not merely remote or speculative. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). QCER has failed to demonstrate how they are currently suffering or will suffer irreparable harm absent an injunction. QCER principally argues that Counter-Defendants will continue using its confidential information and trade secrets. D.E. 24 at 20. However, as argued *supra*, there is no valuable confidential information at issue. *See also* Younani Decl. Ex. A, at ¶¶6, 7, 14. The information identified by QCER as confidential is readily available from public sources. *Id.* at ¶¶6, 14. It was QCER's burden to demonstrate actual and imminent irreparable harm—they have failed to do so.

QCER also alleges harm as a result of Skyline's competition. But Skyline's operations do not irreparably harm QCER. Most significantly, QCER is not eligible to bid on to the work that Skyline is now performing, which is hauling oil for Chesapeake in Ohio. *Id.* at ¶¶41-42.

QCER has been banned from hauling oil for Chesapeake in Ohio. *Id.* at ¶42. Additionally, QCER has closed its Ohio terminal, which would have handled the work that Skyine is now performing. *Id.* Counter-Defendants have not harmed QCER by bidding for and winning a job that QCER was not allowed to bid on and could not have performed. Even if this Court were to find that Skyline's competition harmed QCER, damages could be quantified, rendering injunctive relief unnecessary. QCER has failed to demonstrate anything other than, at best, calculable money damages and therefore is not entitled to injunctive relief.

### III. THE HARM THAT AN INJUNCTION WOULD CAUSE COUNTER-DEFENDANTS OUTWEIGHS ANY THREATENED INJURY TO QCER

QCER provides two flawed arguments for their position that the threatened injury to them outweighs the harm that an injunction would cause Counter-Defendants. First, QCER reasons that it will face continued competition, solicitation of prospective customers, and use of its confidential and trade secrets. DE 24 at 20-21.  This argument fails because there are no substantial, protectable customer relationships at issue and no truly confidential information. Further, the alleged harm is entirely speculative, not actual and imminent as it must be for an injunction to issue.

Second, QCER argues that harm to Counter-Defendants cannot be considered.  QCER is wrong. *See TransUnion Risk & Alternative Data Sols., Inc. v. MacLachlan*, 625 F. App'x 403, 407 (11th Cir. 2015) (court must consider harm to individual in issuing injunction to enforce restrictive covenant under Florida law). The Court must consider the effects that a preliminary injunction will have on Counter-Defendants. Should a preliminary injunction issue, Skyline will cease hauling. Younani Decl. Ex. A., at ¶44. There will be no revenue. Skyline will lay off its entire staff and default on its obligations. *Id.* Younani will be personally liable for Skyline's obligations and will not be able to fulfill those obligations. *Id.* A preliminary injunction in this

18

case would not be temporary—it would end Skyline's business permanently and bankrupt Younani. *Id.*

In sum, there will be no harm to QCER between now and when the case is tried, as Skyline is only performing work on which QCER cannot even bid. To the extent QCER has any legally cognizable damages, they can be easily calculated. By contrast, Skyline will not survive the duration of a preliminary injunction if one is issued. The balance of harms clearly favors this Court not issuing a preliminary injunction.

## IV. INJUNCTIVE RELIEF DISSERVES THE PUBLIC INTEREST

The public's interest is in ensuring that contractual agreements are enforced to the extent that they are in accord with Florida law. Because the restrictive covenants at issue here are not reasonably necessary to protect a legitimate business interest, they are naked restraints of trade and therefore unenforceable. A preliminary injunction in this case would disserve the public interest.

## V. QCER SHOULD BE REQUIRED TO POST A BOND

In the event the Court issues a preliminary injunction, QCER should be required to post a bond. Fla. Stat. §542.335 states, "No temporary injunction shall be entered unless the person seeking enforcement of a restrictive covenant gives a proper bond, and the court shall not enforce any contractual provision waiving the requirement of an injunction bond or limiting the amount of such bond." Skyline earns approximately $300,000.00 per month, with projections of $3.6 million in revenue this year. Younani Decl. Ex. A, at ¶49. In *North Am. Prods. Corp. v. Moore*, this Court set an injunction bond equal to the Defendant's yearly revenue. 196 F. Supp. 2d 1217, 1232 (M.D. Fla. 2002). Should this Court grant injunctive relief, Counter-Plaintiffs should be required to post an injunction bond in the amount of $3.6 million.

19

## CONCLUSION

For the foregoing reasons, QCER's Motion for Preliminary Injunction should be denied in its entirety. Counter-Defendants respectfully request an evidentiary hearing. *See, e.g., Moon v. Med. Tech. Associates*, 577 F. App'x 934 (11th Cir. 2014) (evidentiary hearing required prior to issuance of injunction in "hotly contested" non-compete matter).

Dated July 22, 2016

Respectfully submitted,

By: s/ Jonathan E. Pollard

Jonathan E. Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com

Pollard PLLC
401 E. Las Olas Blvd. #1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380
Facsimile: 866-594-5731

*Attorneys for Counter-Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a true and correct copy of the foregoing to be electronically filed on July 22, 2016. All registered counsel are to receive notice of the filing via the Court's electronic case filing system.

By: s/ Jonathan E. Pollard